# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  58832-3-II |
| Respondent, | |
| v. | |
| ABRAN RAYA LEON, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Following a jury trial, Abran Raya Leon appeals his conviction for second degree felony murder, where a police officer was murdered in the course of Raya Leon's and others' actions relating to the trafficking of stolen property.  Specifically, Raya Leon urges us to adopt the *Pinkerton*[1] doctrine of reasonable foreseeability for acts of co-conspirators and argues that the State failed to prove he acted with knowledge that he was facilitating a murder.  Raya Leon also challenges his offender score, arguing that the trial court improperly included an out-of-state conviction in its calculation of his offender score.

Because the Washington Supreme Court has held that the *Pinkerton* doctrine is inapplicable to Washington law, we decline Raya Leon's request to adopt the *Pinkerton* doctrine.  Also, because the record shows Raya Leon committed the underlying felony of his felony murder charge, we affirm his conviction for second degree felony murder.  Additionally, because Raya Leon's out-of-state conviction is factually comparable to a Washington statute, we hold that the

---

[1] *See generally Pinkerton v. United States*, 328 U.S. 640, 66 S Ct. 1180, 90 L. Ed. 1489 (1946).

No. 58832-3-II

trial court properly included the out-of-state conviction in its calculation of Raya Leon's offender score. Accordingly, we affirm Raya Leon's conviction and sentence.

FACTS

A.    BACKGROUND

Raya Leon is married to Misty Raya.[2]  Between March 2021 and July 2021, Raya Leon was serving a jail sentence in Clackamas County Jail in Clackamas, Oregon.

Over the days of June 1, June 2, and June 3, 2021, Misty and Brian Clement burglarized a storage unit in Clark County.  Misty and Clement stole 27 firearms, 30,000 rounds of ammunition, ballistic vests and helmets, and identification documents and credit cards belonging to the storage unit owner, Tommy Huynh.

On June 3, Huynh noticed unauthorized charges on his credit card statements from credit cards he knew were stored in the storage unit.  Huynh then discovered that everything had been taken from his storage unit and contacted law enforcement.

One of the unauthorized charges on Huynh's credit card was for Telmate, a communication services company that provides a platform for inmates to contact family and friends outside jail. Law enforcement executed a search warrant on Telmate and found that the charge on Huynh's credit card was to add funds to a Telmate account associated with Raya Leon.

Law enforcement then identified phone calls that occurred between Raya Leon and Misty in June and July 2021.  In the phone calls, Raya Leon and Misty spoke in a mixture of English and Spanish.

---

[2]  Several individuals involved in the events of this case share the same last name as Raya Leon. We refer to those individuals by their first names for clarity.  No disrespect is intended.

2

In the first call on June 3, Misty informed Raya Leon about the guns she had stolen, which included "AK" rifles. 4 Verbatim Rep. of Proc. (VRP) (Aug. 15, 2023) at 1663. Misty also informed Raya Leon about her attempts to sell the guns. Raya Leon told her, "[W]e'll figure something out when I get out." 4 VRP (Aug. 15, 2023) at 1666.

In the second call on June 13, Misty again informed Raya Leon about her negotiations with other individuals to whom she had sold the stolen guns, along with pricing.

On June 30, Raya Leon called Misty.[3] Misty told Raya Leon she was packing to leave her home because she saw an undercover police officer sitting in a car outside her house. Raya Leon told Misty to be careful.

Then, on July 13, Raya Leon and Misty had a video call. In the video, Misty appears to be at a storage unit.

During the time these calls were made, the Clark County Sheriff's Office Tactical Detective Unit, an undercover, plainclothes unit, began investigating Misty. Law enforcement identified the storage unit Misty had been sitting at during her July 13 video call with Raya Leon. The storage unit was registered to Raya Leon's mother. On July 16, law enforcement executed a search warrant on the storage unit and recovered eight rifles, along with "two AR lowers,"[4] other gun parts, and identification documents, all belonging to Huynh. 2 VRP (Aug. 9, 2023) at 740.

On July 21, Raya Leon was released from Clackamas County Jail. On July 22, police executed a search warrant on Misty's residence in Portland, Oregon. Misty rented two rooms in a

---

[3] The June 30 phone call, identified as Exhibit 288, was not designated in the record on appeal.

[4] "AR lowers" are the "lower portion of an AR rifle," intended "for people [who] like to build their own AR rifles." 2 VRP (Aug. 9, 2023) at 740.

house. In Misty's rooms, police found items belonging to Huynh, including one of his credit cards. Misty was not present when police executed the search warrant. Police then secured a warrant for Misty's arrest. Additionally, law enforcement obtained a written trace order for Misty's phone so they could locate Misty and arrest her.

B.      EVENTS OF JULY 23, 2023

On the morning of July 23, members of the Tactical Detective Unit received "pings" for Misty's phone, which provided location information for her phone. 2 VRP (Aug. 8, 2023) at 613. Law enforcement could see that Misty had traveled to the Longview and Castle Rock area.

Plainclothes detectives in unmarked vehicles followed the pings and located a car they believed belonged to Misty—a silver Volvo—at a motel in Castle Rock. The Volvo contained the guns and ammunition stolen from Huynh's storage locker. The detectives set up surveillance at the motel and called for additional law enforcement assistance. The detectives then observed Raya Leon, Misty, and Raya Leon's brother, Guillermo Raya Leon, at the motel.

While at the motel, Guillermo became suspicious that uncover officers were following them. Although Raya Leon did not believe Guillermo, the three decided to leave the motel anyway. Raya Leon, Misty, and Guillermo got into the Volvo and left the motel. Raya Leon drove. Initially, Raya Leon drove north on I-5, but he then made a U-turn and began driving south on I-5.

Law enforcement attempted to follow and engage in a high-risk traffic stop. Raya Leon sped away from the police vehicles and took evasive maneuvers. Police were unable to detain them.

4

After the failed traffic stop attempt, detectives again tracked Raya Leon, Misty, and Guillermo through the pings from Misty's phone. The detectives followed the Volvo at a distance to a shopping center parking lot where Raya Leon had pulled off. At that time, the detectives requested assistance from the Vancouver Police Department's Neighborhood Response Team (NRT), another plainclothes, unmarked vehicle unit, to assist with surveillance.

After evading law enforcement, Raya Leon continued driving south into Portland, Oregon and pulled off in the parking lot of a shopping center. Raya Leon stopped at the shopping center because the brakes on the Volvo were not working properly. Misty then texted her friend, Lani Kraabell, asking Kraabell to pick them up.

Kraabell arrived at the shopping center parking lot in a Toyota Sequoia. Misty requested a ride from Kraabell, and Raya Leon and Guillermo began transferring large bags and suitcases containing the stolen guns and ammunition into the Sequoia. Raya Leon, Misty, and Guillermo then got into the Sequoia, and Kraabell drove away from the shopping center.

Before Kraabell drove away, NRT detectives had obtained the license plate number for the Sequoia. Law enforcement attempted to follow the Sequoia; however, it was difficult to do so because of rush hour traffic. The police tried to track the pings from Misty's phone, but after Raya Leon, Misty, and Guillermo transferred vehicles, the pings stopped providing data, which meant Misty had either turned off her phone or dismantled it.

Kraabell drove Raya Leon, Misty, and Guillermo to an apartment in Vancouver where Kraabell had been staying with another friend, Shiloh Barrett. Barrett lived in the apartment with Stephen Iverson, with whom Barrett was romantically involved.

The Sequoia that Kraabell drove belonged to Barrett. During the drive between the shopping center and the apartment, Misty asked Kraabell if Kraabell knew anyone who would buy some firearms. Kraabell offered to call a friend of hers, Charles Cooper, who bought and sold stolen goods. As they drove, Guillermo continued to express concern that they were being followed by the police. Kraabell did not believe anyone was following them.

Once Kraabell, Raya Leon, Misty, and Guillermo arrived at the apartment, Raya Leon and Guillermo began unloading the Sequoia and bringing their bags and luggage into the apartment. Several rifles had been wrapped in a blanket. Guillermo then repositioned the Sequoia so it faced outward from a parking spot in front of the apartment.

After Kraabell, Raya Leon, Misty, and Guillermo left the shopping center, the detectives again requested additional law enforcement resources. Detectives, including Detective Jeremy Brown, from the Drug Task Force[5] responded to the request. The Drug Task Force is another plainclothes, undercover unit. After checking on the Sequoia's license plate, detectives from the Drug Task Force identified the Sequoia as associated with a specific apartment—Barrett's apartment—and went there. Law enforcement found the Sequoia at the apartment complex.

Detective Brown and Detective Rodrigo Osorio, also a member of the Drug Task Force, positioned themselves inside the apartment complex to conduct surveillance. Other law enforcement officers were in the vicinity. Detective Osorio parked at another building in the apartment complex and could view the back of the Sequoia. Detective Osorio witnessed Raya

---

[5] The Drug Task Force is an inter-agency regional team, which includes detectives from the Vancouver Police Department, Washington State Patrol, and the Clark County Sheriff's Department.

Leon and Guillermo unload large bags and luggage from the Sequoia. Detective Brown drove a red Jeep. Detective Brown parked in a spot with view of the rear of the apartment.

Inside the apartment, Raya Leon, Misty, Guillermo, and Kraabell waited for Cooper to respond to Kraabell's messages to him. Guillermo continued to express concern that law enforcement was watching them. Guillermo pointed out a "red . . . vehicle—an SUV type," which happened to be Detective Brown's vehicle. 3 VRP (Aug. 16, 2023) at 1338. No one else believed Guillermo.

Guillermo decided to "go check it out."[6] 3 VRP (Aug. 14, 2023) at 1338. Allegedly, Guillermo intended only to confront Detective Brown and ask Detective Brown why he was following them. However, Guillermo had a gun with him.

Guillermo approached Detective Brown's vehicle from behind and fired one shot at Detective Brown through the rear driver's side window. The bullet struck Detective Brown in his left arm, then passed through the left side of his chest to the right side, penetrating his heart in the process. Detective Brown returned several shots before dying at the scene. The other detectives tracking Raya Leon, Misty, and Guillermo did not initially realize Detective Brown had been shot.

Guillermo was not hit by any of Detective Brown's shots. Guillermo ran back to the apartment and told Raya Leon that they needed to leave immediately because he had been involved in a shooting. Guillermo believed that his shot had missed.

---

[6] Accounts differ as to whether Misty or Kraabell told Guillermo to go check out the red "SUV type" vehicle. 3 VRP (Aug. 14, 2023) at 1338.

Raya Leon, Guillermo, and Misty rushed out of the apartment and jumped into the Sequoia, for which Guillermo still had the keys. Raya Leon drove away from the apartment complex in the Sequoia. They left their bags at the apartment.

Law enforcement began pursuing the Sequoia. In the meantime, the Vancouver Police Department began responding to the apartment complex based on calls it had received from residents regarding gunshots.

Raya Leon drove northward on I-205. Traffic was still heavy at that time, so law enforcement officers were unable to get directly behind Raya Leon. Raya Leon began driving erratically to evade the police. He drove onto the highway shoulder to pass other vehicles, which created large clouds of dust. The pursuing officers lost sight of the Sequoia because of the dust.

While attempting to evade the police, Raya Leon lost control of the Sequoia and ended up crashing the Sequoia just past a highway exit. Raya Leon, Misty, and Guillermo left the Sequoia and began running through the backyards of nearby residences. Guillermo ran faster than Raya Leon. Raya Leon could not keep up and decided to hide in a bush in the backyard of a home, and Misty joined him. Guillermo kept running and Raya Leon did not meet up with him again.

Law enforcement responded to where the Sequoia had crashed and began searching for Raya Leon, Misty, and Guillermo. Officers brought K-9 units to assist with the search. A K-9 unit discovered Raya Leon and Misty hiding in the bush and dragged Raya Leon out. Law enforcement arrested Raya Leon and Misty.

Police then obtained a search warrant for the house where Raya Leon and Misty were found. In a planter on the back patio, police discovered the gun Guillermo used to shoot Detective Brown.

Police also obtained and executed a search warrant on Barrett's apartment. During the search, police found several bags and boxes of ammunition. However, the police did not recover any firearms.[7]

On July 25, law enforcement apprehended Guillermo in Salem, Oregon. Guillermo was in possession of a car he had stolen from the house where Raya Leon and Misty were arrested.

Over the course of two police interviews that occurred on July 24 and July 27, Raya Leon admitted to several of the facts detailed above. Specifically, Raya Leon admitted to knowing the guns were stolen and the plan to sell the guns. Additionally, Raya Leon knew Guillermo was worried about being followed by the police and that Guillermo had a gun with him when he left the apartment to confront Detective Brown. Finally, Raya Leon admitted to leaving the apartment with Guillermo and Misty because he knew a shooting had occurred.

## C.    PROCEDURAL HISTORY

In a third amended information, the State charged Raya Leon with second degree felony murder, possession of a stolen firearm, and first degree unlawful possession of a firearm. Raya Leon's charge of second degree felony murder stated:

> That the defendant, ABRAN RAYA LEON, in the County of Clark, State of Washington, on or about July 23, 2021, committed the crime of Conspiracy to commit Trafficking Stolen Property in the First Degree, to-wit: stolen firearm(s) and ammunition, a felony, and in the course of and in furtherance of said crime or in immediate flight therefrom, he or another participant caused the death of a person

---

[7] After Raya Leon, Misty, and Guillermo fled Barrett's apartment, Iverson arrived. Iverson and Kraabell found the firearms among the bags that had been left behind by Raya Leon, Misty, and Guillermo. Iverson and Barrett were upset that Barrett's car had been taken, and Iverson decided to take the guns as collateral pending the return of Barrett's car. Iverson put the firearms inside a storage ottoman and later took the guns to a storage unit he owned. Iverson eventually met with Cooper and sold the guns to Cooper.

other than one of the participants, to-wit: Clark County Sheriff's Office Deputy Jeremy Brown; contrary to Revised Code of Washington 9A.32.050(l)(b).

Clerk's Papers (CP) at 365.

The matter proceeded to a jury trial in which several witnesses testified to the facts described above.

1.     Jury Instructions

The State provided the trial court with proposed jury instructions. Defense counsel did not object to the State's proposed jury instructions. However, defense counsel provided the trial court with proposed supplemental jury instructions. Specifically, defense counsel wished to include jury instructions on proximate cause and foreseeability as it pertained to Raya Leon's murder charge.

The State objected to the proposed supplemental jury instructions, arguing that proximate cause and foreseeability were not applicable in a felony murder context. Defense counsel argued that the proposed supplemental jury instructions should be included based on the defense's theory of the case, which was that Guillermo's shooting of Detective Brown was a separate act outside any conspiracy. The trial court agreed with the State and denied the proposed supplemental jury instructions on proximate cause and foreseeability.

The trial court provided the following instructions to the jury:

Instruction No. 11

A person commits the crime of Murder in the Second Degree when he commits Conspiracy to commit Trafficking in Stolen Property in the First Degree and in the course of and in furtherance of such crime or in immediate flight from such crime he or an accomplice causes the death of a person other than one of the participants.

CP at 380.

No. 58832-3-II

Instruction No. 12

A person commits the crime of Conspiracy to commit Trafficking in Stolen Property in the First Degree when, with intent that conduct constituting the crime of Trafficking in Stolen Property in the First Degree be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

CP at 381.

Instruction No. 14

A person commits the crime of Trafficking in Stolen Property in the First Degree when he or she knowingly initiates, organizes, plans, directs, manages or supervises the theft of property for sale to others or traffics in stolen property knowing the property was stolen.

CP at 383.

Instruction No. 21

A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

11

CP at 390.

Instruction No. 22

To convict the defendant of the crime of Murder in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about July 23, 2021, the defendant committed Conspiracy to commit Trafficking in Stolen Property in the First Degree;

(2) That the defendant or an accomplice caused the death of Clark County Sheriff's Office Deputy Jeremy Brown in the course of and in furtherance of such crime or in immediate flight from such crime;

(3) That Clark County Sheriff's Office Deputy Jeremy Brown was not a participant in the Conspiracy to commit Trafficking in Stolen Property in the First Degree; and

(4) That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 391.

2.      Verdict and Sentencing

The jury found Raya Leon guilty of all charges.

Prior to Raya Leon's sentencing hearing, both the State and Raya Leon filed sentencing memorandums. Raya Leon had two prior Oregon convictions: delivery of methamphetamine and unlawful use of a vehicle. The parties disputed the inclusion of Raya Leon's conviction for

unlawful use of a vehicle for the purposes of calculating his offender score.[8] The State argued that the conviction was factually comparable while Raya Leon argued it was not.

Raya Leon pleaded guilty to unlawful use of a vehicle. Raya Leon's plea statement stated, in pertinent part: "The factual basis for my guilt is: I was operating a 4 wheeler (off road vehicle) I knew was stolen on 8/25/17." CP at 524.

During the sentencing hearing, the State conceded that Oregon's unlawful use of a vehicle statute was not legally comparable to Washington's possession of a stolen vehicle statute. However, the State argued that Raya Leon's unlawful use of a vehicle conviction was factually comparable. Raya Leon, on the other hand, argued that his plea statement was insufficient to provide a factual basis for violation of the Washington statute because there was no language that Raya Leon withheld the vehicle from the true owner—in other words, the State needed to show "intent to deprive." 5 VRP (Aug. 31, 2023) at 2125.

The trial court agreed with the State. The trial court stated:

All right. Thank you, Counsel. I appreciate the legal argument on that issue. It's always interesting when you see how different states define different crimes.

The question for this Court is whether under Washington law and juris prudence [sic] governing the question of comparability analysis for purposes of calculating criminal history, whether the Oregon conviction does qualify here. Although it may not be an exact fit, the Court looks at substance . . . .

The distinction here is unpersuasive really from the Defense. . . . But, substantially, the crimes seen, and in conclusion to this Court is satisfied with the comparability analysis and would calculate the—criminal history at sentencing.

---

[8] Raya Leon had two prior Oregon convictions for unlawful use of a vehicle. The parties agreed that one of those two prior convictions was not legally or factually comparable. Additionally, the parties did not dispute the comparability and inclusion of Raya Leon's Oregon conviction for delivery of methamphetamine for the purposes of calculating his offender score.

5 VRP (Aug. 31, 2023) at 2126. Raya Leon's resulting offender score was 4.

The State requested that the trial court sentence Raya Leon to the high end of his standard sentencing range, or 325 months.[9] Raya Leon requested that the trial court impose a low to mid-range sentence. The trial court sentenced Raya Leon to 325 months, the high end of his standard range.

Raya Leon appeals.

ANALYSIS

Raya Leon challenges his conviction for second degree felony murder, arguing that the State failed to show that he "killed Detective Jeremy Brown or acted with knowledge that he was facilitating a murder." Br. of Appellant at 1. Raya Leon also asserts the trial court erred when it included his Oregon conviction for unlawful use of a vehicle in its calculation of his offender score and that the trial court failed to engage in a "meaningful" comparability analysis. Br. of Appellant at 2.

A. FELONY MURDER

1. Legal Principles

In Washington, individuals are held strictly responsible for any deaths that result from the commission or attempted commission of a felony. *State v. Dennison*, 115 Wn.2d 609, 616, 801 P.2d 193 (1990). "The purpose of the felony murder rule is to deter felons from killing negligently

---

[9] The 325 months included a 60-month firearm sentencing enhancement.

or accidentally by holding them strictly responsible for killings they commit." *State v. Leech*, 114 Wn.2d 700, 708, 790 P.2d 160 (1990).

A person is guilty of second degree felony murder if "[h]e or she commits or attempts to commit any felony, including assault, . . . and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants." RCW 9A.32.050(1)(b). The statute establishes a mechanism "by which one who commits a predicate felony may be criminally liable for a homicide committed in the course of that felony by a coparticipant in the commission of the underlying felony." *State v. Carter*, 154 Wn.2d 71, 78-79, 109 P.3d 823 (2005) ("Thus, though one participant in a predicate felony, alone, commits a homicide during the commission of, or flight from, such felony, the other participant in the predicate felony has, by definition, committed felony murder.").

The State does not need to prove that the "nonkiller participant was an accomplice to the homicide." *Id.* at 79. Instead, "the mens rea for felony murder is based solely on the mens rea for the predicate offense." *State v. Bolar*, 118 Wn. App. 490, 502, 78 P.3d 1012 (2003), *review denied*, 151 Wn.2d 1027 (2004); *State v. Kosewicz*, 174 Wn.2d 683, 691-92, 278 P.3d 184 ("The predicate felony merely substitutes for the mental state the State is otherwise required to prove."), *cert. denied*, 568 U.S 967 (2012).

A participant must be either a principal—one who directly commits the underlying felony—or an accomplice, or "one who meets the statutory definition of accomplice," to the underlying felony. *Carter*, 154 Wn.2d at 79. However, "[i]n cases where an individual charged only with felony murder was involved in planning and setting in motion the underlying felony but

did not participate in the actual commission of that crime, both accomplice liability and coparticipant liability must operate in order for him or her to be convicted of felony murder." *Id.*

An individual is guilty of a criminal conspiracy when "with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement." RCW 9A.28.040(1).

Under RCW 9A.82.050(1), a "person who knowingly initiates, organizes, plans, finances, directs, manages, or supervises the theft of property for sale to others, or who knowingly traffics in stolen property, is guilty of trafficking in stolen property in the first degree." To traffic means to "sell, transfer, distribute, dispense, or otherwise dispose of stolen property to another person, or to buy, receive, possess, or obtain control of stolen property, with intent to sell, transfer, distribute, dispense, or otherwise dispose of the property to another person." RCW 9A.82.010(19).

2.      Sufficient Evidence Supports Raya Leon Committed Felony Murder

Raya Leon argues that the State did not prove beyond a reasonable doubt that he had knowledge he was facilitating the murder of Detective Brown. Raya Leon further argues that we should adopt the *Pinkerton* doctrine, which provides that an individual is vicariously liable for offenses committed by co-conspirators only when the offenses are reasonably foreseeable. We decline adoption of the *Pinkerton* doctrine and hold that sufficient evidence supports Raya Leon's felony murder conviction.

The record shows that the underlying felony of Raya Leon's second degree felony murder charge is "Conspiracy to commit Trafficking Stolen Property in the First Degree, to-wit: stolen firearm(s) and ammunition." CP at 365. The third amended information alleged that during the

commission of that felony, Raya Leon "or *another participant* caused the death of a person other than one of the participants, to-wit: . . . Jeremy Brown" in violation of RCW 9A.32.050(1)(b). CP at 365 (emphasis added). Under the felony murder rule, the State only needed to prove that Raya Leon committed the predicate felony—conspiracy to traffic stolen property—for Raya Leon to be guilty of felony murder. *Bolar*, 118 Wn. App. at 502; *Kosewicz*, 174 Wn.2d at 691-92. Contrary to Raya Leon's argument, the State did *not* need to prove that Raya Leon was an accomplice to the homicide. *Carter*, 154 Wn.2d at 79.

Here, the evidence is clear that Guillermo, not Raya Leon, shot and killed Detective Brown. The evidence also shows that Raya Leon, Guillermo, and Misty were involved in a conspiracy to traffic stolen firearms. In early June 2021, Misty burgled a storage unit containing 27 firearms and 30,000 rounds of ammunition, among other items. Misty informed Raya Leon of the burglary over several jail phone calls and provided Raya Leon with details about her interactions with buyers and the prices of guns she sold. Raya Leon, during those conversations, opined on Misty's attempts to sell the firearms, and told her, "[W]e'll figure something out when I get out." 4 VRP (Aug. 15, 2023) at 1666. Raya Leon later admitted to police that he knew the firearms were stolen.

After Raya Leon was released from jail, he, Misty, and Guillermo checked into a motel near Castle Rock. They kept the stolen guns and ammunition in Misty's Volvo, which they had driven to the motel. When Guillermo became suspicious of police following them, the three of them agreed to leave the motel. Then, while driving away from the motel, Raya Leon engaged in evasive tactics to avoid apprehension by the police.

Later, when Kraabell picked up Raya Leon, Misty, and Guillermo in Portland, they transferred the bags and suitcases containing the stolen guns and ammunition to Kraabell's vehicle.

While the group drove to the apartment, Misty and Kraabell began discussing who might purchase the guns, and Kraabell identified Cooper. Raya Leon admitted to police that they planned to sell the guns at Barrett's apartment in Vancouver, where Kraabell had taken them. Thus, sufficient evidence supports that Raya Leon, with Misty, Guillermo, and Kraabell, conspired to traffic stolen firearms. RCW 9A.28.040(1); RCW 9A.82.010(19), .050(1).

While waiting at the apartment to hear back from Cooper about selling the stolen firearms, Guillermo continued to be suspicious that police were following them. After noticing Detective Brown's vehicle, Guillermo decided to "go check it out" with a gun. 3 VRP (Aug. 14, 2023) at 1339. Guillermo then shot and killed Detective Brown. Guillermo immediately returned to the apartment, told Raya Leon what had happened, and then Raya Leon, with Guillermo and Misty, fled with Raya Leon driving. Thus, sufficient evidence shows that Guillermo, another participant in the conspiracy to traffic stolen firearms along with Raya Leon, caused the death of another person in the furtherance of that conspiracy. RCW 9A.32.050(1)(b).

In his brief, Raya Leon contends that "[a]ccomplice liability is relevant in this case to the extent that it ties [Raya Leon] to the predicate felony." Br. of Appellant at 32. He then focuses his argument on what is required "to convict . . . Raya Leon of second degree felony murder based on accomplice liability." Br. of Appellant at 32. Specifically, Raya Leon argues that he did not act "with knowledge that he was facilitating a murder when possessing or trafficking the stolen guns." Br. of Appellant at 41.

Raya Leon's conclusory statements betray a fundamental misunderstanding of the felony murder rule and appear to assume Raya Leon was only an *accomplice* to the underlying felony rather than a direct participant. Accomplice liability may apply in some felony murder contexts,

specifically in instances "where an individual charged only with felony murder was involved in planning and setting in motion the underlying felony but did not participate in the actual commission of that crime." *Carter*, 154 Wn.2d at 79. In those cases, "both accomplice liability and coparticipant liability must operate in order for him or her to be convicted of felony murder." *Id.* But that is not the case here. As discussed above—and as was the State's theory of the case during trial—Raya Leon was a *direct participant* in the underlying felony, which was conspiracy to commit trafficking stolen property (firearms and ammunition) in the first degree.

Raya Leon also argues that we should "apply the standard of reasonable foreseeability set forth in *Pinkerton v. United States* when evaluating liability for the actions of co-conspirators." Br. of Appellant at 30. However, in *State v. Stein*, the Washington Supreme Court unequivocally held "the *Pinkerton* doctrine is inapplicable to Washington law." 144 Wn.2d 236, 248, 27 P.3d 184 (2001). We are bound by *Stein*. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). Thus, *Pinkerton* does not apply.[10] Raya Leon offers no clear reasoning as to why this court should

---

[10] *Stein* provides:

> Although the Washington [conspiracy] statute makes all parties to the conspiracy guilty of the conspiracy itself, it is silent on the subject of crimes committed by coconspirators. No Washington case holds a defendant liable for the substantive acts of coconspirators without also satisfying the elements of accomplice liability and no Washington case cites *Pinkerton* as the basis for conspiratorial liability.

144 Wn.2d at 244. In *Stein*, the appellant was convicted of several counts of attempted murder, all based on vicarious liability. *Id.* at 239-40. On appeal, he challenged the jury instructions and at issue was "whether the instructions were adequate to convey the concept of vicarious liability under Washington law." *Id.* at 240-244. Raya Leon does not raise a jury instruction challenge. Thus, *Stein* is distinguishable and not applicable here.

depart from *Stein* and instead advances an argument based on the apparent assumption that Raya Leon was charged as an accomplice.

Raya Leon points to the inclusion of Instruction No. 21, which defined "accomplice," and argues that it allowed the jury to convict him of felony murder in the absence of his knowledge that Guillermo was going to shoot Detective Brown. Br. of Appellant at 41. However, the record is clear that Instruction No. 21 was included to define "participant" as found in RCW 9A.32.050(1)(b). A participant is either a principal of the underlying felony or an accomplice. *Carter*, 154 Wn.2d at 79. The State addressed the instruction during closing arguments and stated:

> And then, No. 21. It's called the accomplice instruction. It basically tells you that one person is guilty for the conduct of somebody that is an accomplice to the acts that they're committing. It says if a person aids or agrees to aid in the planning or the committing of the crime, they're an accomplice. Obviously, [Raya Leon], his brother Guillermo, Misty, *they're all accomplices clearly in this same crime*.

5 VRP (Aug. 17, 2023) at 2069 (emphasis added).

Furthermore, Instruction No. 21 was followed by Instruction No. 22, the to-convict instruction for felony murder, which provided in part:

> To convict the defendant of the crime of Murder in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about July 23, 2021, the defendant committed Conspiracy to commit Trafficking in Stolen Property in the First Degree;
>
> (2) That the defendant or an accomplice caused the death of Clark County Sheriff's Office Deputy Jeremy Brown in the course of and in furtherance of such crime or in immediate flight from such crime;
>
> (3) That Clark County Sheriff's Office Deputy Jeremy Brown was not a participant in the Conspiracy to commit Trafficking in Stolen Property in the First Degree; and

20

(4) That any of these acts occurred in the State of Washington.

CP at 391. Instruction No. 22 accurately articulates RCW 9A.32.050(1)(b) and makes clear that Raya Leon was not charged as an accomplice in the death of Detective Brown.

Because the evidence shows that Raya Leon conspired to commit trafficking in stolen property, and that another participant in the conspiracy, Guillermo, caused the death of Detective Brown in furtherance of that conspiracy, we hold sufficient evidence supports Raya Leon's conviction for second degree felony murder.

B.      FOREIGN CONVICTION COMPARABILITY

1.      Legal Principles

Courts review the calculation of a defendant's offender score de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187, *cert. denied*, 574 U.S. 912 (2014). Under the Sentencing Reform Act of 1981, chapter 9.94A RCW, a defendant's prior convictions are used to determine his or her offender score, which establishes their presumptive standard sentencing range. *State v. Arndt*, 179 Wn. App. 373, 377-78, 320 P.3d 104 (2014); *see generally* RCW 9.94A.525. In cases where a defendant's criminal history includes out-of-state convictions, a sentencing court must "classify the convictions 'according to the comparable offense definitions and sentences provided by Washington law.'" *State v. Tewee*, 176 Wn. App. 964, 967-68, 309 P.3d 791 (2013) (quoting RCW 9.94A.525(3)), *review denied*, 179 Wn.2d 1016 (2014). "We also review this comparability determination de novo." *Id.*

Courts employ a two-part test to determine an out-of-state offense's comparability. *State v. Thiefault,* 160 Wn.2d 409, 415, 158 P.3d 580 (2007). First, the court must determine if the out-of-state offense is legally comparable, or "whether the elements of the [out-of-state] offense are

substantially similar to the elements of the Washington offense." *Id.* If so, the analysis stops and the out-of-state offense is included in the calculation of an offender score. *Tewee*, 176 Wn. App. at 968. However, if the out-of-state offense has elements that are broader or different than Washington's equivalent statute, courts must determine if the out-of-state offense is factually comparable. *Id.* In assessing factual comparability, courts "determine whether the conduct underlying the [out-of-state] offense would have violated the comparable Washington statute." *Id.*

"In making its factual comparison, the sentencing court may rely on facts in the [out-of-state] record that are admitted, stipulated to, or proved beyond a reasonable doubt." *Thiefault*, 160 Wn.2d at 415. Sentencing courts may also consider facts conceded by the defendant in guilty pleas as admitted facts. *Arndt*, 179 Wn. App. at 381. Additionally, "[w]e may review the defendant's conduct, as evidenced by the facts alleged in the charging document and proved beyond a reasonable doubt, to determine whether his conduct would have violated the comparable Washington statute." *Tewee*, 176 Wn. App. at 968. If an out-of-state conviction is neither legally nor factually comparable, courts may not include the conviction in the calculation of a defendant's offender score. *Arndt*, 179 Wn. App. at 380.

2.    Raya Leon's Oregon Conviction is Factually Comparable

Raya Leon first argues that the trial court did not conduct a "meaningful factual comparability analysis." Br. of Appellant at 48. Raya Leon then argues that the State failed to prove Raya Leon's Oregon conviction for unlawful use of a vehicle is factually comparable to the narrower Washington statute of possession a stolen vehicle.

Here, the parties do not dispute that Oregon's unlawful use of a vehicle statute is not legally comparable to Washington's possession of a stolen vehicle statute.[11] *See generally* Former OR. REV. STAT. § 164.135 (2008); RCW 9A.56.068. Thus, we must assess whether Raya Leon's conduct underlying his Oregon conviction would have violated RCW 9A.56.068. *Tewee*, 176 Wn. App. at 968. To do so, we may rely on facts in the Oregon record that are admitted or stipulated to, as well as facts that are conceded in the guilty plea. *Thiefault*, 160 Wn.2d at 415; *Arndt*, 179 Wn. App. at 381. Here, when Raya Leon pleaded guilty to unlawful use of a vehicle, his plea statement stated, in pertinent part: "The factual basis for my guilt is: I was operating a 4 wheeler (off road vehicle) I knew was stolen on 8/25/17." CP at 524.

Raya Leon argues "'operation'" of a motor vehicle found in Oregon Revised Statute 164.135 is not the same as the "possession" found in RCW 9A.56.068. Br. of Appellant at 50. However, and as the State points out in its brief, one cannot "'operat[e]'" a vehicle without possessing it. Br. of Resp't at 36 (alteration in original).

Next, Raya Leon argues that his "guilty plea contains only the inference that can be made that [Raya Leon] knew the vehicle was stolen; it is not clear whether he withheld the [vehicle] from the true owner, as required in Oregon's statute." Br. of Appellant at 50-51. But withholding

---

[11] The record shows that in Oregon in 2017, Raya Leon pleaded guilty to unlawful use of a vehicle under former Oregon Revised Statute § 164.135. The 2017 version of Oregon Revised Statute § 164.135 provided, in relevant part: "A person commits the crime of unauthorized use of a vehicle when: . . . [t]he person takes, operates, exercises control over, rides in or otherwise uses another's vehicle, boat or aircraft without consent of the owner." Former OR. REV. STAT. § 164.135(1)(a) (2008). In Washington, a "person is guilty of possession of a stolen vehicle if he or she possess[es] . . . a stolen motor vehicle." RCW 9A.56.068(1). Because the Oregon and Washington statutes contain different elements that are not substantially similar, they are not legally comparable. *See Thiefault*, 160 Wn.2d at 415.

the vehicle from the true owner is not an element of the Washington statute. RCW 9A.56.068(1). Moreover, contrary to Raya Leon's argument, Raya Leon *explicitly stated* in his guilty plea statement that "[he] *knew* [the vehicle] was stolen." CP at 524 (emphasis added). Thus, Raya Leon's guilty plea statement demonstrates he possessed a stolen vehicle. *See Arndt*, 179 Wn. App. at 382. This conduct violates RCW 9A.56.068(1). Therefore, Raya Leon's Oregon conviction for unlawful use of a vehicle is factually comparable to RCW 9A.56.068(1). Accordingly, we hold the trial court properly included the Oregon conviction when calculating Raya Leon's offender score.

CONCLUSION

The *Pinkerton* doctrine is inapplicable to Washington law; therefore, we decline Raya Leon's request to adopt the *Pinkerton* doctrine. Also, sufficient evidence in the record shows that Raya Leon committed the underlying felony of his felony murder charge, supporting his conviction for second degree felony murder. Additionally, because Raya Leon's out-of-state conviction is factually comparable to a Washington statute, the trial court properly included the out-of-state conviction in its calculation of Raya Leon's offender score. Accordingly, we affirm Raya Leon's conviction and sentence.

No. 58832-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, J.

Veljacic, A.C.J.

25